IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARL E. JACKSON,<br>    Plaintiff, | ) No. 2020-cv-5630<br>)<br>) |
| v. | ) Judge: Charles P. Kocoras<br>) |
| CITY OF CHICAGO, et al<br>    Defendants. | ) Magistrate Judge Susan E. Cox<br>)<br>) Jury Demand |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT LOCAL RULE 56.1(a)(3)
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiff, **CARL JACKSON** (hereinafter referred to as "Plaintiff" "Jackson"), by and through his attorney, Danielle A. Pinkston, of the Pinkston Law Group, P.C., responds to Defendants ("Defendants") Local Rule Statement Of Material Facts, pursuant to 56.1(e)(1)(2)(3), submitting the following responses to in opposition to Defendants' joint motion for summary judgment. The pleadings, deposition transcripts, and exhibits cited to in this statement are attached hereto.

| Description | Exhibits |
|---|:---:|
| OEMC Querry | A |
| Carl Jackson's First Amended Complaint | B |
| Defendants' Answer to Plaintiff's Amended Complaint | C |
| Defendants' Motion For Summary Judgment | D |
| Carl Jackson's Rule 33 Answers | E |
| Carl Jackson's Rule 34 Responses | F |
| Video of Gardner and Rodriguez prior to 9/20/18 taken by Carl Jackson | G |
| Renne Gardner Rule 33 Answers | H |
| Rodriguez Rule 33 Answers | I |
| Gardner and Rodriguez Joint Rule 34 Joint Responses | J |
| Prisoner Transport | K |
| Arrest Report | L |
| Original Case incident Report | M |
| Carl Jackson's Traffic Ticket | N |
| Carl Jackson's Criminal Case Disposition | O |

| Carl Jackson's Deposition Transcript | P |
|---|---|
| Renee Gardner's Deposition Transcript | Q |
| Gabriel Rodriguez Deposition Transcript | R |
| Renee Gardner's Body Camera Footage (BWC) | T |
| Gabriel Rodriguez Body Camera Footage (BWC) | U |
| Crot's Body Camera Footage (BWC) | V |
| Carl Jackson's Declaration | W |

## THE PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Carl Jackson (hereinafter "Jackson"), brought this action pursuant to 42 USC § 1983, making claims of false arrest, conspiracy, failure to intervene, and indemnification. See Second Amended Complaint (ECF No. 33), attached hereto as Exhibit A, *generally*. Plaintiff alleges generally that Defendant Chicago Police officers Gabriel Rodriguez and Renee Gardner (hereinafter "Defendant officers") arrested Jackson without probable cause; conspired with each other to falsely arrest Jackson; failed to intervene to prevent the false arrest, and the City of Chicago should indemnify the Defendant officers. Exh. A, at ¶¶ 23- 45, and *generally*.

   **RESPONSE:** Jackson admits the statements in paragraph 1.

2. The Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331, § 1343. Exh. A, ¶ 2.

   **RESPONSE:** Jackson admits the statements in paragraph 2.

3. Venue is proper as the events giving rise to the alleged claims occurred within the Northern District of Illinois, namely Chicago. Exh. A, at ¶ 3.

   **RESPONSE:** Jackson admits the statements in paragraph 3.

4. Rodriguez and Gardner were, at all relevant times, duly appointed police officers of the City of Chicago and acting within the scope of his employment and under color of law. *See* Defendant Officers' Answer to Plaintiff's Second Amended Complaint (ECF No. 43), attached hereto as Exhibit B, at ¶ 6-9.

**RESPONSE:** Jackson admits the statements in paragraph 4.

## INCIDENT

5. On September 22, 2018, the City's Office of Emergency Management and Communications (OEMC) received a 911 call that three males in a gold Buick sell drugs near 7847 S. Cottage Grove Ave. *See* OEMC Query Report, attached hereto as Exhibit C; Deposition of Gabriel Rodriguez, "Rodriguez Dep.," attached hereto as Exhibit D, 211:20- 24; 213:3-9.

**RESPONSE:** Jackson denies the statements in paragraph 5 and demands strict proof thereof. This allegation is hearsay, considering no 911 calls have been produced as evidence. If Defendants had valid, reliable, admissible information, such as the actual call that was made to OEMC, it would have included it. The OEMC Querry Report, indicates that a wireless call was received on September 22, 2018 at 21:46:16 and the caller stated, "Everyday From 3-6 3 Males Sit On Top Of Gold Buick And Sell Drugs NFI." (Ex. A, OEMC Querry Report at 2).

| Event Chronology-1826512781 | | | | |
|---|---|---|---|---|
| **Date** | **Wkstn** | **Person** | **Activity** | **Text** |
| Sep 22, 2018 21:46:16 | PADM06 | D115561 | CLEAR | 661E |
| Sep 22, 2018 21:46:16 | PADM06 | D115561 | CLOSE | |
| | | | RMKS | *** WIRELESS CALL*** |
| | | | RMKS | EVERYDAY FROM 3-6 3 MALES SIT ON TOP OF GOLD BUICK AND SELL DRUGS NFI |

Ironically, this call was allegedly made 4-5 hours after Jackson was stopped, seized, frisked, and arrested. There is objective evidence from the Defendant City of Chicago because while Jackson was locked up, he was issued a ticket 18:49 on September 22, 2018 because someone drove his car through a red light. (Ex. N). At his deposition, Rodriguez was shown the same Office of Emergency Management and Communications (OEMC) Querry report (Ex. R, 211:23-24, Ex. A at 2) he stated he had not seen if before, but agreed the date on it was 9/22/2018, the time was 21:46:16, (Ex. R, 21:46:16) and under remarks, it states, "wireless caller," and then it says, "every day from three to six, three males sit on top of gold Buick and sell drugs. NFI" which Rodriguez said stands for "No further information." (Ex. R, 212:1-19). That is all the information the officer had. Rodriguez did not believe there was just one Buick in the City of Chicago, stating, "That would be probably physically impossible, but, no, I do not believe there is one Buick." (Ex. R, 104:13-19). In Rodriguez's report he said, "A call of three males that sit in a gold Buick between three and six sell drugs at this location" (Ex. R, 137:18-22) but he only observed the vehicle and the one occupant inside. (Ex. R, 138:1-2). Rodriguez admitted the anonymous caller did not tell if the individuals were male or female, but he believed they had the OEMC printout (Ex. R, 100:15-17) stating, "I couldn't tell you exactly what the description of the call was. I know vaguely that the actual -- it was a narcotics selling and that the location of the vehicle was at that said location. I couldn't tell you the specifics based on the timeframe from then and now." (Ex. R, 100:19-23). Rodriguez was as asked since he did not have any specifics about who he was actually going to see, would it have been important for him to conduct some kind of surveillance prior to stopping and

detaining and arresting Jackson and he responded, "Those are not things we do." (Ex. R, 101:3-12, SOFA ¶26-27, 29).

6.  In response to the 911 call, OEMC dispatched Officers Rodriguez, Gardner, and Crot to investigate. *See* OEMC Query Report, Exh. C; Rodriguez Dep., Exh D, 22:22-23; 23:2-5; and Deposition of Renee Gardner, "Gardner Dep.," attached hereto as Exhibit E, 15:3-24.

**RESPONSE:** Jackson denies the statements in paragraph 6 and demands strict proof thereof. See Response to ¶5. This allegation is hearsay, unauthenticated and should be stricken. If Defendants had valid, reliable, admissible information, such as a recording of the actual dispatch from OEMC, they would have included it. Rodrigue testified, "They say we have to investigate in order to be able to effect an arrest or not." (Ex. R, 103:12-23). He said the caller stated, "…that a tan vehicle was sitting at the above listed location, and there was individuals in and out of the vehicle selling narcotics (Ex. R, 19:17-20). Rodriguez said he could not recall if they said it was a tan vehicle or a gold vehicle. (Ex. R, 19:21-22). The anonymous caller told 911, (Ex. R, 20:1-2) there were people selling narcotics out of the vehicle; they did not tell the location; Rodriguez did not recall if they gave a license plate number; (Ex. R, 20:2-10) if the caller described the car the individuals were selling drugs from; (Ex. R, 20:11-14) if the people who were selling drugs were male, female; (Ex. R, 20:14-17) or were black, white, Hispanic, or Asian. (Ex. R, 20:17-20). Rodriguez does not believe the caller said what kind of drugs they were allegedly selling and did not leave a name or phone number. (Ex. R, 20:20-21:4). There was no way for Rodriguez to identify who the caller was; (Ex. R, 22:9-11) he does not know if this

anonymous caller had a personnel vendetta against Jackson. (Ex. R, 22:11-19). Allegedly OEMC notified them to go to the particular location where Mr. Jackson was located (Ex. R, 22 21-23) "They just stated that it was a narcotics, selling narcotics job at that above location. (Ex. R, 23:1-5, 10:16). Rodriguez assumed that the person they were referring to was Mr. Jackson. (Ex. R, 27:12-14).

7. On September 22, 2018, Rodriguez and Gardner were on duty as a Chicago police officers in the 006 District, dressed in full uniform, including a department issued body worn camera. Rodriguez Dep., Exh. D, 24:11-24.

    **RESPONSE:** Jackson denies the statements in paragraph 7 and demands strict proof thereof. The Officers may have been in full uniform and had on a body camera, but they failed to keep their cameras on at all times and focused on the entire. Jackson does not know when the officer started filming or if all of the officers who were present had their body cameras on. (Ex. P, 168:10-24).

8. Upon arrival to 7847 S. Cottage Grove Ave., Defendant Rodriguez located the gold Buick and witnessed Plaintiff, who was sitting in the front passenger seat, reach down towards the floorboard. Rodriguez Dep., Exh. D, 28:9-23; 29:3-9; 31:17-21; 33:1-6.

    **RESPONSE:** Jackson denies the statements in paragraph 8 and demands strict proof thereof. Though the three officers rode in the same car and were wearing their body cameras, no one made reference to seeing Jackson reach down and this is not depicted in any footage. Rodriguez was shown more footage from an officer's body camera and he identified the back of Jackson's vehicle he indicated, "looks close to like a grayish

color." (Ex. R, 186:15-24). Rodriguez was asked if Jackson was breaking any laws as he was sitting in his vehicle and replied, "Based on the call, we had to investigate the narcotics selling then he stated," then he said, "At that moment, no." (Ex. R, 105:11-106:2). Gardner was asked if it was illegal or against the law for a person to reach down in their vehicle (Ex. Q, 25:20) and stated, "It's not illegal" (Ex. Q, 26:1-4). Gardner was asked if she was stating, if a person in their vehicle reaches down, that gives her and her partners and other C.P.D., Officers the ability to search their person and the immediate area (Ex. Q, 26:5-9) and she responded, "It gives us -- we can then try to investigate what's going on, why are, why are you reaching, why are you reaching down for safety, it could be anything, it could be a weapon, it could be trying to conceal drugs in that area, that's what we're checking." (Ex. Q, 26:9-18). Rodriguez was asked his deposition what were the factors that led to the stop and Rodriguez stated he had had probable cause. (Ex. R, 124:14-18) when asked what was the probable cause he replied, "There was a call for his vehicle specifically doing the narcotic selling (Ex. R, 124:19-23) they gave us probable cause (Ex. R, 125:4) "It cause -- we had probable cause to stop the vehicle and investigate what that anonymous citizen was stating" (Ex. R, 125:15-9) Anonymous callers can give us the probable cause to conduct an investigative stop, which is what we did, which ended up being a narcotics arrest." (Ex. R, 126:5-8).

9.  Defendants Rodriguez and Gardner exited their police vehicle with their body worn camera ("BWC") activated; Rodriguez Dep., Exh. D, 25:17-19, *see also* Rodriguez Body Worn Camera Video, "Rodriguez BWC," attached as Exhibit F, *generally* and Gardner Body Worn Camera Video, "Gardner BWC," attached as Exhibit G, *generally*.

**RESPONSE:** Jackson denies the statements in paragraph 9 and demands strict proof thereof. Jackson does not know if all the officers had their cameras activated (Ex. P, 168:2-16). Gardner was asked if she had her body camera on the entire time from when she approached Jackson's vehicle until he was transported in a different squad car to the police station and responded, "I had my body camera on, I do remember turning it off and then I try -- I remember turning it back on." (Ex. Q, 48:6- 19). Gardner could not state at which point she turned her body camera off, stating, "I can't tell you exactly, I just remember turning it back on, I was sitting in the car, I most likely was running the -- running his name in the car, turned it back on. I can't tell you why I turned it off." (Ex. Q, 48:6-49:2).  She was asked again why she turned her body camera off and stated, "I possibly thought that the investigation was over, he was under arrest at that time, so, I turned, I believe I turned my camera off because of that, but then we were still on the scene so I turned it back on" (Ex. Q, 49:2-10) she continued stating, "When I turned, when I turned my body camera off, he was under arrest at that, at that point." (Ex. Q, 49:11-15). Gardner does not recall if Rodriguez was still searching Jackson's vehicle when she turned her camera off (Ex. Q, 51:15-16) stating, "I don't remember, I don't remember when I turned it back on" (Ex. Q, 51:17-19) nor does she know how long it was turned off stating, "I don't remember how long it was off." (Ex. Q, 5:19-24). Gardner admitted that when her body camera was turned off, it was not filming what was going on at the scene (Ex. Q, 52:1-4) she was asked if she put her fingers in front of her body camera, obstructing the view (Ex. Q, 52: 5-7) and responded, "Put my fingers, no, to turn it off, but my hand may have, when I turn it off, my hand may possibly cover it up a little bit, but, I mean, the button is in the middle so, when you turn it off, your hand may cover

the camera for a second, but you can see that when you're turning it off." (Ex. Q, 52:7-12).

Rodriguez wore a bodycam (Ex. R, 24:13-15) it was on (Ex. R, 24:15-16), not the entire time but for the stop, after custody it was off. (Ex. R, 24:16-19). He turned his body camera off because, "The scene was secured" (Ex. R, 24:19-21) after the arrest was affected, before leaving the scene and he could not recall when he turned it back on. (Ex. R, 106:7-16). Rodriguez does not recall notifying the defendant (sic) that the body camera he were wearing was on. (Ex. R, 26:1-4).

10. Defendant Rodriguez approached Plaintiff, still seated in front passenger seat, and asked him to step out of the vehicle. Rodriguez Dep., Exh. D, 25:17-23; Rodriguez BWC, Exh. F, 00:45-00:48; *See also* Plaintiff's Deposition, "Plaintiff Dep," attached has Exhibit H; 63:23-24; 64:1; 79:2-7; 147:17-19.

**RESPONSE:** Jackson admits the statements in paragraph 10. There is no reason for the officers to have ordered him out the car. The officers pulled up, in front of Jackson's vehicle, both of their, vehicles were facing each other (Ex. Q, 15:13-17) they got out, Rodriguez went to the passenger side (Ex. Q, 15:17-19) and pulled Jackson out his vehicle while Gardner was standing behind Rodriguez or off to the side in the middle of Officer Crot and Officer Rodriguez. (Ex. Q, 15:19-24). While Jackson was sitting in the vehicle, Rodriguez told him to get out and Jackson asked "Why?" (Ex. P, 72:1-6). Jackson does not know which officer placed him in handcuffs. (Ex. P, 75:9-21). No one told Jackson why he was stopped; why he was asked him to get out of his vehicle; what they were searching for; whether they had a search warrant to; and none of them showed

him a search warrant. (Ex. P, 169:9-24). Rodriguez did not recall notifying Jackson that his body camera was on. (Ex. R, 26:1-4).Rodriguez heard Jackson ask what the problem was, but he did not respond to him (Ex. R, 173:10-15) because "Based on the nature of the call and the location we were at, I usually don't indicate what exactly we're stopping people for just so we don't actually get a person who is calm and not violent or may seem violent or anything like that, to change their demeanor throughout the entirety of the stop. So once we actually do the process of what we do, then we began to, okay, this is why." (Ex. R, 173:18-24).

Prior to being stopped by the police, Jackson was not driving his vehicle, did not run any kind of stoplight or stop sign (Ex. P, 165:16-24) did not fail to use his turn signal, he had not committed an crime, nor had the police seen him commit a crime. (Ex. P, 166:1-14). When Gardner approached Jackson, he did not try to flee, run or did he make any kind of admissions as to guilt. (Ex. Q, 44:16-24). She did not see him commit a felony (Ex. Q, 43:22-24) neither of her partners or anyone nearby the scene saw Jackson committing an kind of felony (Ex. Q, 44:3-6). Gardner said when she and her partners went to Jackson's vehicle, they did not smell cannabis burning or anything emanating from the car or the windows. (Ex. Q, 45:1-89). After Rodriguez pulled Mr. Jackson from the vehicle, he conducted a pat-down. (Ex. Q, 21: 5-9). Gardner stood there for a couple of seconds and then walked to the back of the vehicle to speak to Jackson. (Ex. Q, 21: 9-11). Jackson told Gardner that he does not sell drugs, and he wasn't doing anything illegal. (Ex. Q, 28:4-7). She said she explained to him what was going on and why they were there. (Ex. Q, 21:11-12). She believed her partner informed her that he had found

something, she walked back to Rodriguez, and he showed her narcotics (Ex. Q, 21:12-15). Gardner stated OEMC told her that the vehicle was gold in color (Ex. Q, 17:1-3) she does not recall them giving her a license plate (Ex. Q, 17:3-4) does not recall who called in this suspicious activity into OEMC or 911 (Ex. Q, 17:4-8) if it was a man or a woman. (Ex. Q, 17:8-15). The alleged suspects were African American or black men, but the caller did not give a skin color of and Gardner who is black, admitted that African Americans can be different shades. (Ex. Q, 17:18-24). When she arrived at the scene, Gardner did not see anyone, including Mr. Jackson, doing anything suspicious (Ex. Q, 18:1-11) there was one individual, Jackson in the vehicle. (Ex. Q, 18:11-16). She did not see any other individuals around the vehicle (Ex. Q, 18:16-22) and admitted that she did not see Jackson committing any crime at the time that she and her partners arrived. (Ex. Q, 18:22-19:2). None of the police officers had a search warrant to search Jackson's vehicle because as Gardner stated, "We didn't need a, we need a search warrant, we didn't need a search warrant at that -- we weren't searching the vehicle when we first got there, we didn't search the vehicle, we didn't need a search warrant." (Ex. Q, 45:9-19).

He did not try to locate the other individuals (Ex. R, 50:7-9) did not talk to anyone in the surrounding businesses about the alleged call (Ex. R, 50:9-12) because, "It's not a part of the procedure (Ex. R, 50:13) it was not part of his investigation to ask local businesses if they observed anything as well (Ex. R, 50:14-23) it's something we don't do as far as our traffic stop -- our stops or anything like that. Unless they -- it's based on the nature of it is when that would happen." (Ex. R, 51:1-6).

11. Plaintiff was the owner of the gold Buick and Plaintiff was the only occupant of the vehicle when Rodriguez and Gardner arrived. Plaintiff Dep, Exh. H, 64:9-10; Rodriguez BWC, Exh. F, 00:33-00:45; Gardner BWC Exh. G, 00:35-00:51.

**RESPONSE:** Jackson admits the statements in paragraph 11.


12. Defendant Rodriguez performed a protective pat down of Plaintiff. Rodriguez Dep. Exh. D, 31:15-16; Rodriguez BWC, Exh. F, 00:51-02:11.

**RESPONSE:** Jackson denies the statements in paragraph 12 and demands and strict proof thereof. Ironically, Rodriguez stated, "We don't just get out the car and just start searching people (Ex. R, 17:24-18:1) but he did. Rodriguez was asked if when he went to the scene had he seen a crime being committed and responded, "I had then investigated if a crime was being committed. (Ex. R, 214:11-12) "At which moment" (Ex. R, 214:15) "Not at the moment, no, when I arrived, no." (Ex. R, 214:18-19. Rodriguez did not see Jackson or anyone near his vehicle selling drugs (Ex. R, 128:1-3) but he believed it "Gave me a probable cause to investigate the situation at hand, yes the situation, yes. The actual narcotics, the selling -- narcotics selling call, yes." (Ex. R, 128:4-10). Rodriguez said, " Probable cause is the means or the justification for a said action." (Ex. R, 128: 15-16) it has to be more than a hunch (Ex. R, 128:18-19) it has to be some articulable fact or observations. (Ex. R, 128:120-122).


Rodriguez ordered Jackson out of his vehicle, "Based on his movements upon approach from exiting my vehicle (Ex. R, 28:9-12) "He, at the -- he was sitting in a seated position and bent at the waist straight down towards his shins, and then raised back up by the time

I got back to the -- I got to his vehicle" (Ex. R, 28:13-17) he essentially saw a private citizen sitting in a vehicle, and move forward. (Ex. R, 28:17-24). When asked what was suspicious, Rodriguez testified, "In my experience of people actually doing those motions and actually eyeing me, as I'm approaching them, they have concealed contraband as well as weapons." (Ex. R, 29:1-10). Rodriguez said what the anonymous caller told OEMC is what gave him reasonable suspicion to stop and search Jackson's vehicle. (Ex. R, 213:11-16). When asked if Jackson was eyeing him, Rodriguez stated, "He was looking directly at me as I approached the vehicle. Within that same actual motion of me exiting the vehicle, yes." (Ex. R, 29:11-19). Rodriguez was asked if his bodycam depicted these motions or these actions that he testified about today and his response was, "Based on my eye level in a seated position I was in, as I saw that and I approached, it does not -- it captures his actual movement. It doesn't (Ex. R, 29:19-24) capture him actual eyeing me based on distance." (Ex. R, 30:1).

Rodriguez exited his vehicle (Ex. R, 30:10-12) went to Jackson's vehicle (Ex. R, 30:12-14) and asked him to step out of the vehicle. (Ex. R, 30:14-17). When Rodriguez approached Jackson's vehicle, he didn't see any weapons in plain sight (Ex. R, 39:1-8) could not recall whether he smelled any cannabis or any crack emanating from his vehicle (Ex. R, 39:8-10). Rodriguez did not inform Jackson that he was a police officer (Ex. R, 30:1-20) he had Jackson step out his vehicle, "Based on the actions that he did of actually doing the motions, like bending down at the waist to the floorboard and back, raising back up as of my approach, I wanted to remove him from the area in case he was concealing a firearm or contraband." (Ex. R, 30:14-31:3). Rodriguez could not recall if

this anonymous caller told him that he saw or he knew Jackson and the other individuals were armed and dangerous. (Ex. R, 31:3-7) Rodriguez was asked what was suspicious about a private citizen sitting in his vehicle, bending forward, and he responded, "Based on the nature of the call, I still have to investigate the entire stop." (Ex. R, 33:16-2). Rodriguez patted Mr. Jackson down and did not find any weapons, contraband, or any illegal substances on his person (Ex. R, 34:1-7) regardless of not finding anything, Rodriguez searched the immediate area of where Jackson was sitting. (Ex. R, 34:8-10). Gardner said Rodriguez did a pat-down on Mr. Jackson he was maybe searching for weapons or contraband (Ex. Q, 22:5:11) and she guesses he was investigating why Mr. Jackson was reaching down (Ex. Q, 22:11-13) she admitted that Rodriguez did not find any kind of weapons or contraband on Jackson's person (Ex. Q, 22:18-21) but she cannot tell why the investigation or the search of Jackson did not stop there. (Ex. Q, 22:22-24). Gardner admitted that neither of her partners had a search warrant to search Mr. Jackson's person saying, "We don't need a search warrant to search a person" (Ex. Q, 23:1-5) because "He is investigating what, because for safety he, we pulled up and he saw him reached down, so he is investigating what, what he reached down for, so, we have -- we can search, we can search -- do a protective pat-down for that purpose." (Ex. R, Q 23:7-12).

Gardner was asked once more why did the investigation did not end at that time when there were no weapons or contraband found on Jackson (Ex. Q, 24:16-22) and she state, "Because Officer Rodriguez searched the immediate area, which was where he reached down, which like, the bag was found on the floorboard, so, he was searching the

immediate area. (Ex. Q, 23:19-22). Gardner was asked if she was saying that if any citizen in Chicago reached down in their vehicle, that that gives the City of Chicago Police Officers the ability to search their person and their vehicle (Ex. Q, 25:2-7) and she responded, "No, I didn't say search the vehicle, we searched the immediate area. we --he didn't search the vehicle. I didn't search the vehicle, he didn't search the vehicle, he searched the immediate area." (Ex. Q, 25:7-15).

13. After the pat down, Plaintiff was escorted to the rear of his vehicle and had a conversation with Officer Gardner. Gardner Dep., Exh. E, 27: 11-20; Rodriguez BWC, Exh. F, 2:11-2:16; Gardner BWC, Exh. G, 02:25-02:39.

**RESPONSE:** Jackson denies the statements in paragraph 13 and demands strict proof thereof.

Jackson was placed under arrest and put in handcuffs and arrested. Jackson asked what was the problem two times (Ex. P, 182:24-183:1-4) and nothing was ever answered they never stated what the problem or gave him an answer. (Ex. P, 182:13-18). Rodriguez was shown body camera footage while he was searching through the vehicle, and agreed that the person's bodycam did not record what he did for six minutes and 56 seconds, while he looked through the trunk. (Ex. R, 192:4-12). Rodriguez stated he stopped looking through the trunk, this person did start recording the back of the vehicle. (Ex. R, 192:12-193:8). At one point in the video the person has his/her hands in front of the bodycam and no one could see what was in front of the person. (Ex. R, 193:9-13). Gardner testified that Jackson was, "at the rear of the vehicle" (Ex. Q, 51:3-6) when asked if the investigation was complete, correct she testified, "I, in my -- I believe it was,

and I turned it off, but then I turned it back on. (Ex. Q, 51:7-10). No one told Gardner to turn her body camera off (Ex. Q, 52:14-16) she had received a general order regarding body cameras, (Ex. Q, 52:16-18) and though she cannot recall the "wording on the body camera, she said, "..We turn our body camera on when we, we get a call, we turn -- we're supposed to activate our body cameras. (Ex. Q, 53:18-20) and they're supposed to be, stay on until your investigation is complete." (Ex. Q, 53:20-23).

Gardner stated that from her experience and training, an investigation complete, "When I, I mean when I feel the investigation is complete." (Ex. Q, 54:14-17). That means that the suspect, has been arrested or the suspect has been let go (Ex. Q, 54:18-20), "When we're done, we turn it off, we're making an arrest and we're finished. (Ex. Q, 54:21-22). She was asked if she believed that it was complete because she believed Mr. Jackson was placed under arrest and she said, "Exactly," but then she was asked, "But you did not hear anyone place him under arrest, correct?" She responded incoherently, "I didn't, that's --nobody said -- no, nobody, no (Ex. Q, 55:-10-22) "Officer Rodriguez informed me that he was under arrest. We have, we have -- he told me, he's good to go, which is, we work together for over a year and sometimes we use certain lingo to inform each other that somebody is, is under arrest, we don't always say, "he's under arrest," it's just." (Ex. Q, 56:1-6). She was asked whether Jackson had been placed in the squad car when she cut off her body camera and stated, "I don't know if he was in the squad car at that time, at that point, I don't remember, but he eventually was put into a squad car." (Ex. Q, 56:20-24).

14. In the immediate vicinity of where Plaintiff was sitting, there was a black and red Chicago Bulls backpack on the front passenger side floorboard of the vehicle. Rodriguez Dep., Exh. D, 139: 2-24; 140:1-3, 200:21-24; Rodriguez BWC, Exh. F, 02:16-02:19; Plaintiff Dep., Exh. H, 91:16-24, 93:7-9.

**RESPONSE:** Jackson admits the statements in paragraph 14. Bag was not Jackson's. He was sitting in the passenger seat with his feet outside the car, on the curb of the sidewalk, looking at whatever storefront was in front of him on Cottage Grove Avenue, looking east essentially. (Ex. P, 79:2-24). Jamal asked Jackson if he could put his bag in his car and Jackson said yes. (Ex. P, 51:5). Jamal asked Jackson if he could have a lift and Jackson agreed to drop him off because he was going the same way, northbound. (Ex. P, 55:6-57:1, (Ex. P, 57:1-13). Jackson did not know what was in the backpack (Ex. P, 56:20-57:1) or that it had an illegal substances in it. (Ex. P, 177:13-15). If Jackson knew this, he would not have allowed Jamal to place it inside his Buick nor would he have offered him a ride. (Ex. P, 179:1-15). Gardner said she could search people when they have, when they have reasonable articulable suspicion to do that, when a crime has been committed or is, is being committed at the time, when they see something. (Ex. Q, 13:4-14). When they don't have the facts to do that, they can't search, they just can't go off of a whim and say, let's search. (Ex. Q, 13:20-24).

15. Believing Plaintiff had possibly concealed a weapon before the officers exited their vehicle, Defendant Rodriguez searched the bag. Rodriguez Dep., Exh. D, 29:6-9, 215:2-5; Rodriguez BWC, Exh. F, 02:19-03:07.

**RESPONSE:** Jackson denies the statements in paragraph 15 and demands strict proof

thereof. On September 22, 2018, when Rodriguez and Garnder approached Jackson, he realized they were the same officers involved from a previous incident. (Ex P, 66:13-23). A week before the September 22, 2018 incident, Rodriguez and Gardner harassed him when he was in his car eating; they came out and said he had to leave the area. Jackson asked for what as he had not done anything. (Ex P, 67:7-16). Jackson took out his phone and videoed them (Ex. P, 67:17-24) asked for their names and badge numbers but Rodriguez, the male officer, kept refusing, the female officer did not make any sounds, and did not answer any of his questions. (Ex P, 68:3-5). The male officer (Rodriguez) kept on hollering, "Negative, negative." Jackson informed him that he was videoing him, that he was harassing him, and if anything should be put up on him, he wanted it nullified. (Ex P, 68:5-9, Ex P, 69:1-4). Jackson believes that on September 22, 2018, the officers retaliated against him because of the previous incident (Ex P, 184:1-2, 183:5-13). Gardner had seen Jackson prior to September 22, 2018. (Ex. Q, 39:19-24).

Jackson was placed under arrest and put in handcuffs. (Ex. P, 63:20-12). He did not try to run or flee when he saw Rodriguez approaching. (Ex. R, 32:8-1). Jackson complied when the officers stopped and asked him to get out of his vehicle and at no time did he resist. (Ex. P, 172:18-22). Jackson was standing outside of his vehicle and did not he make any kind of aggressive movements, he was compliant with whatever they were telling or instructing him to do. Gardner stated Jackson was concerned about why they stopped him or made him get out of his vehicle. (Ex. Q, 47:14-48:4).

16. Defendant Rodriguez recovered four clear zip lock baggies of suspect cannabis, a scale,

and multiple clear empty zip lock baggies. Rodriguez Dep., Exh. D, 69:23-24, 70:1-9; 201:24, 202: 1, 202:16-18; Rodriguez BWC, Exh. F, 03:19-03:37 *See also,* Crot Body Worn Camera Footage, "Crot BWC," attached hereto as Exhibit I, 05:56-07:45.

**RESPONSE:** Jackson denies the statements in paragraph 16 and demands strict proof thereof. See Response to ¶15. The cannabis, scale and baggies did not belong to Jackson and Jackson believes the officers lied and said there was something in the bag that was not. (Ex. P, 178:1-9). If Jackson knew the bag had an illegal substance in it, he would not have allowed Jamal to place it inside his Buick nor would he have offered him a ride. (Ex. P, 179:1-15). Jackson told the officers it was not his bag but Rodriguez but one officer said, "We'll see you in court" and Jackson was taken to jail. (Ex. P, 103:1-2). They recovered a backpack from Jackson's vehicle, Rodriguez searched it, but Jackson did not know what was recovered until he got to the police station. Then, he was told they recovered weed and a scale (Ex. P, 93:2-24) but he was never told the quantity of the marijuana, how it was packaged. (Ex. P, 94:5-17). Rodriguez searched the bag inside the vehicle and not in the open for transparency. Rodriguez was asked when he allegedly found narcotics in Jackson's backpack, if he told anyone he found it (Ex. R, 67:1-3) and testified, "I -- I had a cue word that I had" it was "Good to go. Good, good to go. G-O-O-D, T-O, G-O" (Ex. R, 67:4-9) which to Rodriguez explained, "Based on my career experience and doing arrests, we don't usually typically say, put him under arrest, handcuff him, or things like that because we don't know exactly what the individual that we are in question investigating or on a stop with, how they will react; so, in turn, we actually do a -- a more subtle approach into handcuffing any individual." (Ex. R, 67:10-17) "The officer next to me, my partner who has been my partner initially, she

understands what lingo we use when we're going to effect an arrest. So yes, that's what I said." (Ex. R, 68:7-13. He was asked if Mr. Jackson understood what good to go meant (Ex. R, 68:14-15) and he replied, "I couldn't answer that question. (Ex. R, 68:15-19. Rodriguez stated that his bodycam depicts him saying, "good to go" (Ex. R, 69:1-2) his body camera does not show that he actually found narcotics in the backpack, and he stated, "My body camera doesn't show it based on the actual location of my body camera on my vest and the way the bag was sitting on the seat. But the hand -- the bag, when I handed it to my partner Crot, is actually physically on his body, on his body camera. So, yes, it is on body camera that the narcotics were recovered from his vehicle at the position of where I found them at." (Ex. R, 69:3-17).

In Crot's body camera footage, a lady came out the restaurant and said, "Excuse me, can I get my bag out his car?" (Ex. V at 4:26). Rodriguez was shown the body camera footage and he admitted hearing one of his partners state, "He's asking for a bag, he's asking for a bag, that's probably where it's at." (Ex. Q, 180:9-24). Jackson does not recall if any of the officers spoke to Mr. Butler at the scene either. (Ex. P, 96:6-17, *Id.* at 96:23-97:6, (Ex. P, 100:11-24, (Ex. P, 102:15-24). Jackson's criminal case was dismissed (Ex. P, 191:5-8, Ex. O, Certified Criminal Disposition) but to his knowledge he still has an arrest record 191:9-14.

Rodriguez stated, "It was on the entire time of search up until he was actually placed into custody and we were going to be transporting away from the scene. At that point, the scene was clear and I deactivated my camera." (Ex. R, 215:14-18). Rodriguez said

he searched the red backpack while it was in the vehicle. He was asked why he did not take it out the vehicle to search it and he said, "Because I didn't know what was inside the backpack." (Ex. R, 216:19-217:1) "There's a process on how you conduct an actual search of a vehicle and especially when there's people in the public around. (Ex. R, 217:2-5) "Based on the actual environment that we were in, and the amount of people that were outside, I rather not bring a backpack of which contents I do not know yet into the public's view and eye in order to cause any mass hysteria or anything like that that could possibly jeopardize the safety of my officers that were on the scene with me." (Ex. R, 217:6-16). Rodriguez stated, "I do not search things that I don't know the contents of, especially in this case, particular. I was not going to remove the bag from the vehicle in order to search it because of the fact that I did not know what was in the bag until the -- before prior to searching it. So, I was not going to jeopardize the safety of my officers by bringing something that could have possibly have been anything that could be snatched by an individual that was standing around in the area, which has happened before on many scenes. So, instead of doing that, I leave it in the vehicle where, if anything were to happen, let's say we were to get swarmed by the citizens that were standing outside watching this all unfold, I can just close the door and actually protect it." (Ex. R, 218:1-16).

Rodriguez was asked would he not agree that had he searched the red backpack on Jackson's hood, no one could have accused him of planting contraband in the bag, and he stated, "Based on my body camera footage, you can see that there was no contraband planted in the bag And the -- the backpack was actually searched and seen all the items

and contents on the bag, on the actual hood of the vehicle by Crot's body camera (Ex. R, 220:6-14) then he said, "I don't know where everybody's eyes were looking at that were actually." (Ex. R, 220-16-24).

17. Plaintiff was then placed under arrest and handcuffed by a non-defendant Chicago police officer. Gardner BWC, Exh. G, 02:40-03:04.

**RESPONSE:** Jackson denies the statements in paragraph 17. When asked who placed Jackson under arrest Gardner responded, "Who put handcuffs on him? We did, we did and she meant herself, Officer, Rodriguez, and Officer Crot. (Ex. Q, 50:1-4). Gardner testified and the video showed Rodriguez pull Jackson out the car, they walked him to the back, Gardner talked to him, and then from there he was placed under arrest. (Ex. Q, 16:1-5). Rodriguez was asked if he orally or verbally told Jackson that he was being placed under arrest and he replied, "Again, I didn't handcuff him. I didn't handcuff him physically." (Ex. R, 68:21-24). Rodriguez was asked if any officer told Jackson what he was being arrested for (Ex. R, 107:9-10) and he replied, "I wasn't the one who physically arrested. I actually handcuffed him, but at the station he did know what he was arrested for" (Ex. R, 107:11-13). Rodriguez did not physically tell Jackson he was under arrest (Ex. R, 107:14) and he does not know whether Jackson was under arrest when he stood behind the vehicle. (Ex. R, 46:13-16).

Gardner stated Rodriguez told her "he's good to go" (Ex. Q, 56:1-9) and to her that means, "That he is under arrest" (Ex. Q, 56:9-120). She admitted that Jackson does not know the C.P.D. lingo, like it's good to go or he's good to go. (Ex. Q, 56:12-14). She was

asked how Jackson knew that he was placed under arrest and Gardner testified, "When we put him in the squad car, he must have known he was under arrest." (Ex. Q, 56:15-19, Rodriguez stated he placed under arrest when he found the narcotics. (Ex. R, 46:19-2) then Rodriguez does not know who placed Jackson under arrest (Ex. R, 47:4-6) he did not physically place him under arrest (Ex. R, 47:6-7) he put it in the arrest report (Ex. R, 47:7-11) but he does not know who handcuffed Jackson. (Ex. R, 48:1).

18. As a result of Plaintiff's arrest, his vehicle was to be impounded and Defendant Gardner and Defendant Rodriguez therefore searched the remainder of the gold Buick. Rodriguez Dep., Exh. D, 183:18-24, 184:1-3; Gardner Dep., Exh. E, 30:4-10; Rodriguez BWC, Exh. F, 03:37-10:15; Gardner Exh. G, 03:38-06:13.

**RESPONSE:** Jackson denies the statements in paragraph 18 and demands strict proof thereof. Rodriguez stated that his partner Renee Gardner and no one else's was around when searched the vehicle. (Ex. R. 77:7-14). Gardner was asked if at any point did she search the vehicle while at the scene of the incident and she said yes, "After Mr. Rodriguez informed me he, he found the cannabis, and then from there, "I searched-- then we began, we did a search of the ve-- I did a search of the vehicle in the back, in the back seat." (Ex. Q, 28:8-17). Rodriguez and Gardner searched the vehicle on the scene, but she did not search with him at the police station because as soon as she got to the police station, Gardner went inside and she began printing paperwork (Ex. Q, 31:4-8) that was necessary to process the arrest and custody of Jackson (Ex. Q, 31:8-12) she cannot recall which documents she began printing, but they normally printout the rap sheet, a copy of the driver's license, gang cards, Hot Desk Report, background and arrest

rap sheet. (Ex. Q, 31:13-23). While Gardner was doing this Officer Rodriguez and Officer Crot were searching Jackson's vehicle in the police lot and at no time did she observe them searching it (Ex. Q, 32:15-24) she was not outside with them (Ex. Q, 33:1) she does not know if anyone else was with them, monitoring their search of the vehicle (Ex. Q, 33:2-5). Jackson was place in handcuffs and taken behind his car and a white officer stayed with him (Ex. P, 76:13-24) holding the handcuffs. Rodriguez started searching his car with another police officer he believes was a male figure. (Ex. P, 77:14-24, Ex. P, 92:1-93:1).

19. At no point throughout the incident did any third-party approach Rodriguez and Gardner while they were on scene and take ownership of the bag. Rodriguez Dep., Exh. D, 156:14-24, 157:4-11; Rodriguez BWC, Exh. F, *generally*; Gardner BWC, Exh. G, *generally*.

**RESPONSE:** Jackson denies the statements in paragraph 19 and demands strict proof thereof. See Video. Furthermore, while Jackson was standing in the back of his car handcuffed (Ex. P, 95:4-6) Jamal Butler came out and stated that was his bag his backpack (Ex. P, 94:21-24) Butler told this to the officers that were present. (Ex. P, 95:18-21). Jackson told the officers it was not his bag and Rodriguez with Butler exited Billy's but Rodriguez did not respond to Butler and Jackson does not recall if any of the officers spoke to Mr. Butler at the scene either. (Ex. P, 96:6-17, Ex. P, 96:23-97:6), *Id.* at (Ex. P, 100:11-24, Ex. P, 102:15-24). The officer said, "We'll see you in court" and Jackson was taken to jail. (Ex. P, 103:1-2). In Crot's body camera footage, a lady came out the restaurant and said, "Excuse me, can I get my bag out his car?" (Ex. V at 4:26). Rodriguez was shown the body camera footage and he admitted hearing one of his

partners state, "He's asking for a bag, he's asking for a bag, that's probably where it's at." (Ex. Q, 180:9-24). Rodriguez denied having a conversation with Jamal Butler (Ex. R, 156:10-23) he was asked if Butler told him or other officer on the scene that the bag in the vehicle was his and replied, "I can't speak for other officers and if Mr. Butler approached anyone else besides me, but I know I wasn't approached by anyone throughout the entirety" (Ex. R, 156:15-23) he continued stating, "So, based on the actual question that you had, I cannot speak on what Mr. Butler may have spoken to other officers about. Through the entirety of the event of the initial stop and the actual -- the end of it when he was -- when Mr. Jackson was actually transported, no one approached me saying that they had owned this red bag. I had never seen or heard from a Jamal Butler." (Ex. R, 157:4-11).

20. Plaintiff and his vehicle were transported to the 006 District police station. Rodriguez Dep., Exh. D, 48:3-5

**RESPONSE:** Jackson admits the statements in paragraph 20. After Jackson was placed under arrest he was transported to the Sixth District (Ex. R, 48:4-6) but Rodriguez does not know who transported him. (Ex. R, 48:6-7). Rodriguez could not answer whether the person who drove that vehicle away from the scene put the heroin in the headliner. (Ex. R, 148:1-15). Gardner stated that after she and her partner searched the vehicle, Jackson was transported to the station and the car was impounded (Ex. Q, 30:3-7) she can't recall who drove Jackson's car in, but then they went to the station and started their paperwork for the arrest, to process the arrest. (Ex. Q, 30:3-10). Jackson did not drive his vehicle away from the scene, because he was arrested (Ex. P, 146:20-23) but whomever did,

decided to run a red light and Mr. Jackson got a ticket as a result. (Ex. P, 147:1-9, Ex. N, Red Light Camera Ticket). Rodriguez did not know if the person who drove this vehicle paid for that ticket (Ex. R, 147:12) and was asked if they didn't pay for the ticket, that means Jackson's responsible (Ex. R 147:12-19) and Rodriguez responded, "It is presumed that whoever is the owner of the vehicle would be the one to be the subject to pay for that ticket." (Ex. R 147:18-24). Jackson lost his vehicle because the City took it, impound it, and though Jackson tried to get it back, it was destroyed because he did not pay the fines/fees. (Ex. P, 64:12-65:2, Ex. P, 172:24, Ex. P, 175:20, Ex. P, 175:10-11). Jackson went to 400 West Superior and spoke with a judge and believed that because he won his criminal case, they should have released his car. (Ex. P, 65:4-13). After his vehicle was destroyed, Jackson did not have a means of transportation, so if he you needed to go to the store run errands he would take the bus or train unlike previously when he had his Buick. (Ex. P, 175:15-24). For six or seven months (Ex. P, 176:17-21) Jackson took the bus or the train (Ex. P, 176:2-8) and it was cold outside. (Ex. P, 176:24, Ex. P, 177:1-10).

21. While performing an inventory search of Plaintiff's vehicle at the police station, Defendant Rodriguez uncovered one red zip lock baggie of suspect heroin hidden in the headliner on the driver's side. Rodriguez Dep., Exh. D, 70:10-13, 72:19-24, 73:1-23, 77:21-24, 145:10-16, 150: 7-13.

**RESPONSE:** Jackson denies the statements in paragraph 21 and demands strict proof thereof. The officers are not being truthful. In their Answer to Plaintiff's Amended Complaint, they indicated that cannabis and heroin were both found in the backpack in

Jackson's car. (Ex. C ¶14). At their deposition and in their underlying motion for summary judgment (Ex. D, MSJ) they stated cannabis was found in the backpack and heroin was found in the hardliner of Jackson's vehicle. Rodriguez and his partners transported the bag found in Jackson's car; he does not recall who placed it in their vehicle (Ex. R, 222:18-24). Besides Rodriguez, two to three other officers, including Gardner and Crot, touched the bag to actually move it after it was found in the vehicle. (Ex. R, 223:1). Rodriguez stated that his partner Renee Gardner and no one else's was around when searched the vehicle. (Ex. R, 77:7-14). Rodriquez allegedly found some heroin (Ex. R, 70:12) in the headliner of Jackson's vehicle. (Ex. R, 72:19-23). Jackson was nowhere around because, he was in the station in custody. (Ex. R, 42:5-6, Ex. R, 70:13-17).

When the heroin was allegedly found at the station, Rodriguez's body camera was not on (Ex. R, 73:23-24) nor was it on when he conducted this investigation and put his hand in the headliner (Ex. R, 73:3). When asked why it was not on during these times, Rodriguez stated, "I wouldn't be able to tell you but he agreed that it was important for people to observe and be able to monitor your investigation of this vehicle." (Ex. R, 74:4-11). Rodriguez was asked if he indicated on his report that he found a baggy or some bags of heroin in the headliner of Jackson's vehicle he responded, "Not specifically, but they were found in the vehicle (Ex. R, 150:16-20) his report indicated that he found one clear, red, ziplock baggies (Ex. R, 153:1-2) and after being asked if he found one baggy or more than one baggy he and replied, "It could be a grammatical error, but it was just one bag." (Ex. R, 153:3-9). No one took photos of the bag and the narcotics in Mr.

Jackson's vehicle because a Rodrigue said, "We don't do that. (Ex. R, 43:1-4). Even after the bag was taken to the police station and inventoried no photos were taken (Ex. R, 43:5-7) and Rodriguez did not show Jackson that he found narcotics in a bag that was in his vehicle. (Ex. R, 43:10-1. Jackson was never told by the police officers that heroin was recovered from the vehicle. (Ex. P, 94:5-17).

22. Plaintiff was subsequently charged with possession of controlled substance and manufacturing/delivery of cannabis. *See* Cook County Circuit Court Certified Statement of Disposition, attached hereto as Exhibit J

**RESPONSE:** Jackson admits the statements in paragraph 22. The cannabis and heroin did not belong to Jackson and could have been planted on him by the officers in retaliation. (Ex P, 184:1-2, 183:5-13). Jackson told the officers it was not his bag but Rodriguez but the officer said, "We'll see you in court" and Jackson was taken to jail. *Id.* at 103:1-2. Jackson does not recall if any of the officers spoke to Mr. Butler at the scene either. *Id.* at 96:6-17, *Id.* at 96:23-97:6, *Id.* at 100:11-24, *Id.* at 102:15-24. If Jackson knew the bag had an illegal substance in it, he would not have allowed Jamal to place it inside his Buick nor would he have offered him a ride. (Ex. P, 179:1-15). Jackson's criminal case was dismissed (Ex. P, 191:5-8, Ex. O, Certified Criminal Disposition) but to his knowledge he still has an arrest record 191:9-14. In Crot's body camera footage, a lady came out the restaurant and said, "Excuse me, can I get my bag out his car?" (Ex. V at 4:26). Rodriguez was shown the body camera footage and he admitted hearing one of his partners state, "He's asking for a bag, he's asking for a bag, that's probably where it's at." (Ex. Q, 180:9-24).

23. The recovered suspect narcotics were subsequently tested at the Illinois State Police Lab and confirmed to be cannabis and heroin. *See* ISP Laboratory Report, attached hereto as Exhibit K, Rodriguez Dep., Exh. D, 203:13-24, 204-1-24, 205: 1-5.

**RESPONSE:** Jackson denies the statements in paragraph 23 and demands strict proof thereof. The cannabis and heroin did not belong to Jackson and could have been planted on him by the officers. (Ex P, 184:1-2, 183:5-13). Though the officers were wearing body cameras, the only thing Rodriguez depicted was that is depicted on his bodycam of him finding narcotics in the bag are, "Based on actual words I used, yes." (Ex. Q, 42:11-16). There's no footage of him finding the narcotics in the backpack (Ex. R, 42:11-18) and his reasoning for this was, "Based on the position of where the bag was and my camera is, it didn't pick it up. (Ex. R, 42:18-21). Rodriguez could not answer whether the person who drove that vehicle away from the scene put the heroin in the headliner. (Ex. R, 148:1-15). When Rodriquez allegedly found the heroin (Ex. R, 70:12) Jackson was nowhere around because, "He was in the station in custody" (Ex. R, 70:13-17).

Dated: February 14, 2023

Respectfully submitted,
**PINKSTON LAW GROUP, P.C.**

/s/ Danielle A. Pinkston

_____
Danielle A. Pinkston

Atty. No.: 6302271
54 North Ottawa Street, Suite #110
Joliet, IL. 60432
Office: (773) 770-4771
Fax: (773) 770-4772
dpinkston@pinkstonlawgroup.com
Atty. for: CARL E. JACKSON

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on February 14, 2023, I electronically served and filed the foregoing documents with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants of record.

Jessica L. Griff, Chief Assistant Corporation Counsel
Nicholas Perrone, Assistant Corporation Counsel
City of Chicago, Dept. of Law
2 N. LaSalle, Suite 420
Chicago, Illinois 60602
Fax: (312) 744-6566
Nicholas.perrone@cityofchicago.org
jessica.griff@cityofchicago.org
*Attorneys for Defendants*

/s/ Danielle A. Pinkston
_____
Danielle A. Pinkston