IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARL E. JACKSON, ) | |
|     Plaintiff, ) | No. 2020-cv-5630 |
| ) | |
|   v. ) | Judge: Charles P. Kocoras |
| ) | |
| CITY OF CHICAGO, et al ) | Magistrate Judge Susan E. Cox |
|     Defendants. ) | |
| ) | Jury Demand |

**PLAINTIFF'S LOCAL RULE 56.1(d) STATEMENT OF ADDITIONAL MATERIAL
FACTS AS TO WHICH THERE ARE GENUINE ISSUES OF FACT**

Plaintiff, CARL E. JACKSON, pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.(b)(3), hereby submits the following Statement of Additional Material Facts to which there are genuine issues in opposition to Defendants' Motion for Summary Judgment, stating as follows:

| Description | Exhibits |
|---|---|
| OEMC Querry | A |
| Carl Jackson's First Amended Complaint | B |
| Defendants' Answer to Plaintiff's Amended Complaint | C |
| Defendants' Motion For Summary Judgment | D |
| Carl Jackson's Rule 33 Answers | E |
| Carl Jackson's Rule 34 Responses | F |
| Video of Gardner and Rodriguez prior to 9/20/18 taken by Carl Jackson | G |
| Renne Gardner Rule 33 Answers | H |
| Rodriguez Rule 33 Answers | I |
| Gardner and Rodriguez Joint Rule 34 Joint Responses | J |
| Prisoner Transport | K |
| Arrest Report | L |
| Original Case incident Report | M |
| Carl Jackson's Traffic Ticket | N |
| Carl Jackson's Criminal Case Disposition | O |
| Carl Jackson's Deposition Transcript | P |
| Renee Gardner's Deposition Transcript | Q |
| Gabriel Rodriguez Deposition Transcript | R |
| Gabriel Rodriguez's Body Camera Footage | T |
| Renee Gardner's Body Camera Footage | U |

| Crot's Body Camera Footage | V |
| --- | --- |
| Carl Jackson's Declaration | W |

1. Jackson went to high school at Wendell Phillips in '81, did not graduate, got his GED at Kennedy-King College, (Ex E, Jackson's Rule 33 Answers ¶2, Ex. P, Carl Jackson Dep. Trans. 26:6-22) is certified in the construction field (Ex. P, 26:22-27) works for Affordable A1, (Ex. P, 28:8-13) when needed (Ex. P, 30:2-16) as a laborer, mostly carrying and handing them tools when they need them. (Ex. P, 31:3-12).

2. On September 22, 2018, Jackson believed he had a right to sit in his vehicle, go to Philly's (sic) to get some food to eat, drive his vehicle, be free from unreasonable stops by the police, and to be free from searches by the police. (Ex. P, 164:12-165:10, Ex. B ¶11).

3. When he was arrested by police officers, he lost his liberty by being transported to jail in a police car, and he could not go home that night. (Ex. P, 189:7-16, Ex. K).

4. Even after he was released from jail, Jackson was still on house arrest, or electronic monitoring (Ex. P, 189:16-24, Ex. B) if he wanted to leave his house, he had to call the Cook County Sheriff's office to get verification (Ex. P, 190:1-13) and someone monitored his every move (Ex. P, 190:13-20) from the time he went to court. (Ex. P, 190:20-191:4).

5. Jackson was taken off house arrest because his case was dismissed after one court appearance (Ex. P, 112:14-20, Ex. P, 113:24, Ex. O, Disposition) Jamal Butler was present to testify, make a statement, and submit an affidavit. (Ex. P, 114:10-20).

6. Jackson went to lockup at 78th and Halsted, they took his belt, shoestrings, and any money, or a phone that he had (Ex. P, 105:12-11) he was in lockup for 24 hours (Ex. P, 107:1-6) and after spending time in the lockup, Jackson was taken to 26th and California to another

holding cell the following day with a transfer between Chicago Police and Sheriff's Department. (Ex. P, 108:4-23, Ex. K Prisoner Transport Sheet).

7. Jackson was embarrassed humiliated and when the police officers searched his vehicle on September 22, 11, 2018 and accused him of something he did not do. (Ex. P, 182:9-19).

8. Jackson waited another six to eight hours to see the judge (Ex. P, 109:6-11) bond was set, and he was released on house arrest, with no movement for approximately two weeks unless he called in. (Ex. P, 110:1-22).

9. Jackson had to hire and pay a lawyer to represent him in his criminal case and in this civil case. (Ex. P, 193:1-11).

10. Jackson's emotional injuries started after the incident and are still occurring every day when he walks outside and sees police officers (Ex. P, 126:2-18). He suffered and continues to suffer from sleepiness nights, worriedness about whether he will arrested for something else, he gets shortness of breath and nauseous sometimes if the police pull up behind him and he always worries that he could be the next person to be killed (Ex. P, 125:16-126:1) or beaten up again, believes he could be tasered again, or maybe shot. (Ex. P, 182:21-23, 193:17-24). He constantly feels like somebody is watching him all the time. (Ex. P, 181:1-5).

11. Jackson fears being another black man who will get killed unjustifiably by officers. (Ex. P, 180:1-9). This fear started in March of 2015 when he was beaten, kicked, tasered, punched and he still experiences it today, like three times out of the day if he is outside and sees police officers. (Ex. P, 180:14-24).

12. Jackson purchased a new vehicle after about six months after September 22, 2018 incident (Ex. P, 192:7-9) and paid about $3,500 (Ex. P, 192:10-12) but had his vehicle not been impounded, he would not have had to pay this amount for a new one. (Ex. P, 192:12-19).

13. Jackson believes the officers conspired against him or made an agreement to retaliate against him to violate his Constitutional rights. (Ex. P, 187:23-188:19, Ex. G, Video of Gardner and Rodriguez).

14. Gardner admitted that she her partners got together while they were working and had conversation about the entire incident pertaining to Jackson (Ex. Q, Renee Gardner Dep. Trans, 36:17-24) to discuss what and how much was found, so they could make sure that the report was correct. (Ex. Q, 37:1-3). Gardner cannot recall how many conversations they had (Ex. Q, 37:3-4) who was present (Ex. Q, 37:8-10) nor does not know how many different times they had discussions regarding Jackson and this incident. (Ex. Q, 39:15-19).

15. Gardner did not include in her case report that she searched the rear of the vehicle and did not find anything (Ex. Q, 58:20-24) stating, "I didn't feel that it was necessary" (Ex. Q, 59:1) all despite attending the police academy and being taught the importance of drafting police reports. (Ex. Q, 59:1-6).

16. Gardner stated police reports are important because, "It's a document what happens, it documents the events of a, of, of everything that we do" (Ex. Q, 59:8-11). She agreed that police reports should be truthful, accurate, and comprehensive. (Ex. Q, 59:24-60:1).

17. Gardner was reminded that in this case, she chose not to include that information, and responded, "We included all the, all the important parts of the, the facts of the case. "We,

4

include, I included in the case report." (Ex. Q, 60:4-11) but she failed to include that she searched the back seat and did not find anything. (Ex. Q, 60:11-18).

18. According to Rodriguez, the steps that must be follow before he makes someone get out the car and start searching are, "I exit the vehicle, state your presence. If you are wearing a body camera, announce that you're wearing a body camera that is recording video and audio. At that point, you ask them -- you let them know that this is a loitering hotspot, if that is in fact where you are. And then from then on, you proceed with your investigation." (Ex. R, Gabriel Dep. Trans. 18:2-11).

19. Rodriguez found I.D.'s and a couple of cards on Jackson when he patted him down (Ex. R, 32:8-12) and when asked if things should have been over with and he stated, "No" because the actual nature of what he did like I said, in the beginning when he bent down at the waist towards the floorboard of the vehicle, I still have to investigate what he actually did. I can actually search in that area, his immediate area of where he was seated in order to make sure there was no contraband or no firearms." (Ex. R, 32:12-33:6).

20. Rodriguez was asked who gave him the authority to search the immediate area where he was sitting (Ex. R, 34:1-12) and replied, "Based on the nature of the call. (Ex. R, 35:17-19).

21. Rodriguez did not have a search warrant because as he said, "There was -- there is various steps that actually are in the process of actually getting a search warrant that take place before you can actually get a search warrant." (Ex. R, 35:20-36:3, Ex. B, Amended Complaint ¶13). He did not take any steps to obtain a search warrant (Ex. R, 36:5-8) because, "We don't have search warrants based on narcotic selling calls" (Ex. R 36:9-10) and when asked why he stated, "Honestly, I wouldn't even know how to answer that

5

question for you." (Ex. R 36:10-16). Rodriguez could not recall the general order or what C.P.D. policy stated that he did not have to have a search warrant before he search a person's vehicle (Ex. R 36:18-37:2) but believed there might be one. (Ex. R, 37:22). Rodriguez felt that he had the authority to search Mr. Jackson's vehicle without having a search warrant (Ex. R, 38:1-4) though he did not see him committing any crime when you approached. (Ex. R, 38:4-21).

22. Based on Rodriguez's training and experiences and being an officer the basic steps of a traffic stop are (Ex. R, 51:1-7-12) "I stopped the vehicle either based on a call or we stop the vehicle based on an actual municipal violation or I.V.C. violation. After that, you approach the vehicle, you state your name and your district of work, and at that point you conduct your traffic stop by asking -- letting them know what they did and/or the nature of why you stopped them and ask for all the proper things that you need to be able to drive, such as driver's license, insurance, and registration if need be." (Ex. R, 51:18-52:3).

23. Rodriguez did not follow his usual and customary steps when he stopped Jackson (Ex. R, 52:4-6) because "It wasn't a traffic stop" (Ex. R, 52:7-10) "It was a selling narcotics call." (Ex. R, 52:11-14). Rodriguez believes the steps one is supposed to take when you have a selling narcotics call are, "Exactly what I did. I approached the actual vehicle in question at the above listed address and proceeded on with the investigation." Specifically, I mean, again, like I did, it would be based on -- based on general orders and things like that, which I'm obviously not fully aware of all of them. But based on the actual stop, there is a -- a baseline of how to approach a stop based on a situation and based on the call." (Ex. R, 52:15-53:20).

24. When Rodriguez approached Jackson's vehicle, prior to stopping him, ordering him out the car, and arresting him, he and his partners checked Jackson's license and/or and discovered that he was the owner of the vehicle (Ex. R, 78:17-23) and there were no warrants to his recollection. (Ex. R, 78:24-79:3).

25. Rodriguez's report said Jackson was a documented Gangster Disciple (Ex. R, 79:4-7) though when he approached Jackson, he did make any observations to verify. (Ex. R, 79:12-15).

26. Prior to stopping Jackson, Rodriguez did not conduct any kind of surveillance this day nor any other (Ex. R, 97:14-22) because as he stated, "I don't understand why I would." (Ex. R, 100:11-14). "Not in my particular unit, no." (Ex. R, 101:13-15). When asked again, if it would have been helpful for him to see if Jackson was actually selling drugs, like the anonymous caller said Rodriguez replied, "The observance was already observed by an anonymous person, so, there was somewhat of surveillance or an investigation seen or something was actually seen. So we wouldn't conduct a surveillance on an individual for a call." (Ex. R, 101:16-23).

27. Despite not knowing who this anonymous person was, Rodriguez was asked if it was important for him to conduct some kind of surveillance prior to stopping, detaining, and arresting Jackson, to see if the allegations were truthful or had some kind of veracity (Ex. R, 102:12-22) and Rodriguez stated, "Again, that's not how we work." (Ex. R, 103:3). "When a call comes out for -- whatever various call comes out, you answer to that call. I mean, like I said, there are units that actually do investigations on such things as narcotics selling and things like that, but again, that's something I couldn't speak on." (Ex. R, 103:6-21.

28. Rodriguez was asked if when an anonymous caller accuses someone of committing a crime, if his job was to go and arrest the accused and he stated, "I wouldn't say that it specifically says that we have to go and arrest that person. They say we have to investigate in order to be able to effect an arrest or not." (Ex. R, 103:12-23).

29. Rodriguez admitted in the past he had conducted surveillance prior to stopping and arresting someone who was accused of a crime. (Ex. R, 104:3). When asked what made September 22, 2018, different (Ex. R, 104:4-7) he replied, "I hadn't done surveillance prior to that date. That wasn't a need in my specific -- in that district, it wasn't no need." (Ex. R, 104:3-9).

30. The area and entire district where Rodriguez found Mr. Jackson, is a predominantly black or African American area. (Ex. R, 105:8-11).

31. When asked if he documented who was there, what he did, what he found, and who he gave it to, when he searched Jackson's vehicle, Rodriguez responded, "No, the only person that was there with me was my partner, Gardner." (Ex. R, 109:17-110:12).

32. Rodriguez testified Jackson's seizure was an investigatory stop (Ex. R, 118:9) after having first testified that it was a narcotics arrest or a narcotics investigation then replied, "You were correct the first time. It was a narcotics arrest, but it's an investigatory stop." (Ex. R, 118:10-14)

33. Rodriguez was shown an exhibit that said says, "gang/narcotic related enforcement" and he was asked why he checked the box for no (Ex. R, 119:12-15) and stated, "Based on that special order, this actual box is based on disbursal from a gang hotspot or a narcotic hotspot, and you would give a disbursal time and disbursal number. So that wasn't this, this was an

8

actual call." (Ex. R, 120:19) "You'd have to refer back to that special order to, to know the specifics of what the gang narcotic-related enforcement was." (Ex. R, 121:1-4).

34. Rodriguez did not check off the box that says, "reasonable articulable suspension," stating, "You can only check one of the two. You can't check both boxes. (Ex. R, 129:8-12) "It's in the computer system. I don't understand why you can't check both. You either have one or the other, I mean." (Ex. R, 129:16-18)

35. Rodriguez didn't check any of the boxes that asked what were the reasonable articulable suspicion factors that led to the protective pat-down. (Ex. R, 135:12-15).

36. On this same Exhibit it stated, "Gang/narcotic-related enforcement" and Rodriguez did not check that box, either (Ex. R, 133:10-15) because in his words, "It is based on the actual special order for a gang or narcotic ordering." (Ex. R, 133:9-1).

37. Under the section titled, "Was a protective pat-down conducted" Rodriguez checked, no, and stated, "It was an error." (Ex. R, 134:13-1). Where it stated, "Was the search beyond conducted by consent" Rodriguez checked, yes (Ex. R, 136:6-12) but when questioned whether this was true, he stated, "That would be also in error as well." (Ex. R, 136:13).

38. Rodriguez was asked again if he should be accurate and detailed in his reports and he replied, "Based on the report, yes." (Ex. R, 152:9-12). He was reminded that he was not accurate or detailed and he responded, "In this report, I didn't feel there needed to be detail." (Ex. R, 152:13-18).

39. When asked if he made any notes about who he spoke with Rodriguez stated, "Again, I don't think --Again, I don't take notes" "I don't feel the need or the necessity to take any notes. (Ex. R, 160:8-15).

9

40. Rodriguez agreed that in the arrest report that he drafted, he left out certain details and facts were not included (Ex. R, 162 7-15) stating, "I include what's -- what's needed and necessary in the report. (Ex. R, 169:2-3) "I chose to indicate all things that I needed to be detailed within this report. (Ex. R, 169:16).

Dated: February 14, 2023

Respectfully submitted,
**PINKSTON LAW GROUP, P.C.**

/s/ Danielle A. Pinkston
_____

Danielle A. Pinkston
Atty. No.: 6302271
54 North Ottawa Street, Suite #110
Joliet, IL. 60432
Office: (773) 770-4771
Fax: (773) 770-4772
dpinkston@pinkstonlawgroup.com
Atty. for: CARL E. JACKSON

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on February 14, 2023, I electronically served and filed the foregoing documents with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants of record.

Jessica L. Griff, Chief Assistant Corporation Counsel
Nicholas Perrone, Assistant Corporation Counsel
City of Chicago, Dept. of Law
2 N. LaSalle, Suite 420
Chicago, Illinois 60602
Fax: (312) 744-6566
Nicholas.perrone@cityofchicago.org
jessica.griff@cityofchicago.org
*Attorneys for Defendants*

/s/ Danielle A. Pinkston
_____

Danielle A. Pinkston